IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, )<br>)<br>Applicant, )<br>)<br>vs. )<br>)<br>PUBLIC SERVICE COMPANY OF OKLAHOMA, )<br>)<br>Respondent. ) | Case No. 05-CV-53-TCK-FHM |

**OPINION AND ORDER**

Before the Court is Burlington Northern and Santa Fe Railway Company's ("BNSF") Motion to Vacate and Correct the Arbitration Award of April 24, 2006 ("Motion to Vacate") (Doc. 46).

**I.      Background**

This dispute arises from the parties' long-standing disagreement over rate provisions contained in a Coal Transportation Agreement entered into by the parties in 1985 ("the Agreement"). Although the history of this dispute is lengthy, the following section outlines only those portions of the factual background that are relevant to this Court's determination of BNSF's Motion to Vacate.[1]

   **A.      Relevant Provisions of the Agreement**

The Agreement established rates and other terms governing BNSF's transportation of coal from producers in Wyoming's Powder River Basin to Public Service Company of Oklahoma's ("PSO") Northeastern Power Station at Oologah, Oklahoma. Section 1.1 of the Agreement defines

---

[1] These facts are largely taken from the Arbitration Board's April 24, 2006 Findings of Fact and Conclusions of Law ("2006 Arbitration Decision"), which incorporated the "Parties' Stipulations Regarding Factual Matters and Legal Issues." (*See* Doc. 36; *see also* Parties' Stipulations, Ex. 5 to BNSF's Mot. to Vacate.)

"Base Rate" as the "initially quoted rate as of the effective date of this Agreement." (Agreement, Ex. 1 to BNSF's Motion to Vacate, at § 1.1.) The "Effective Rate" is defined in Section 1.2 as the "Base Rate as adjusted pursuant to the terms of Subsections 4.1 and 4.2." (*Id.* § 1.2.) The Agreement establishes $14.00 as the Base Rate and provides that it "is subject to adjustment under Subsections 4.1 and 4.2." (*Id.* § 4.) Subsection 4.1 outlines specific escalation of rates regarding BNSF's single-line service and Subsection 4.2 establishes an adjustment formula for the rates. Also included in Subsection 4.2 is the following language:

> Except as provided in Section 11, the Effective Rate for Single Line Direct Service by [BNSF] will not be less than the Base Rate in effect on the date this Agreement is filed with the ICC.

(*Id.* § 4.2.) Under Section 11, each party was provided "the right to request renegotiation of the Effective Rate and/or renegotiation of the adjustment method, if such party believes the intentions of the parties as above described above have not been effectuated." (*Id.* § 11.) However, the request for renegotiation was only to "be made during the year 1992." (*Id.*) Finally, Section 13 outlines the circumstances under which an issue shall be submitted to an arbitration board and states as follows:

> If a question or controversy shall arise with respect to the appropriateness of substitute indices (Subsection 4.2), or with respect to renegotiation of the rate or escalation (Section 11), or with respect to the added cost and/or liability of transporting Beneficiated Coal (Section 26), then the dispute or controversy shall be submitted to an arbitration board as set forth in Subsections 13.2 and 13.3 herein.

(*Id.* § 13.1.)

      **B.**    **1992 Price Renegotiations, Subsequent Arbitration, and Termination of Agreement**

In 1992, PSO initiated price renegotiations under Section 11 of the Agreement. Because PSO and BNSF could not agree on renegotiated price terms, PSO invoked the Section 13 arbitration procedures. In accordance with these procedures, PSO selected an arbitrator (Paul H. Lamboley)

and BNSF selected an arbitrator (Emried D. Cole, Jr.). On December 31, 1992, PSO requested then-Chief Judge James O. Ellison to appoint a third arbitrator. The parties submitted the names of potential individuals, and on April 13, 1993, Judge Ellison issued an order appointing Deryl Lee Gotcher as the third arbitrator.

The parties proceeded to adjudicate the dispute before the arbitration board ("Board"), and, on May 16, 1994, the Board issued a unanimous decision and award ("1994 Arbitration Decision"). In its decision, the Board established two new rates – $11.77 per ton for "single-line service" and $12.51 per ton for "joint-line service."[2] (1994 Arbitration Decision, Ex. 3 to BNSF's Mot. to Vacate, at 14.) The 1994 Arbitration Decision also adopted a new adjustment procedure that was intended to adjust the new rates (up or down) based on cost changes of major railroads, including BNSF. (*Id.* 14-15.) The Board's decision was confirmed by Judge Ellison on December 6, 1994, and Final Judgment was entered on December 29, 1994. Judge Ellison's confirmation was subsequently affirmed by the Tenth Circuit on October 20, 1995.

The rate for single-line service, as calculated pursuant to the new adjustment formula, fell below $11.77 per ton for the first time in the quarter beginning in April 1998. Subsequently, the rate fell below this level in the quarters beginning in June, 1996 and October, 1997, and in all quarters thereafter through the final year of the Agreement. On March 22, 1996, BNSF provided PSO with a quarterly notice of adjustment of rates and charges for the quarter commencing April 1, 1996. Included in this notice is BNSF's calculation of the Agreement rates using the Award's adjustment formula and a statement that the rate for single-line service would be $11.77 per ton if the Current

---

[2] The rate dispute at issue in this case involves only BNSF's provision to PSO of single-line service.

Adjusted Rate fell below said amount. By letter dated April 3, 1996, PSO objected to BNSF's March 22, 1996 notice on the grounds that the 1994 Arbitration Decision did not contain such a rate floor. Each time the rate calculated pursuant to the rate adjustment procedures fell below $11.77 per net ton thereafter, BNSF provided PSO with notices of adjustment of the rates at $11.77 per ton. However, on each such occasion, PSO paid BNSF at the rate determined through application of the new adjustment formula, which was less than $11.77 per net ton. BNSF accepted and did not return PSO's rate payments.

In June 2001, PSO notified BNSF that it was invoking its right under the Agreement to terminate the Agreement as of the end of 2001. BNSF thereafter advised PSO that, by its calculation, PSO was responsible for paying BNSF a termination fee of $9,180,000. By check dated January 14, 2002, PSO paid a termination fee in the amount of $8,814,000, which was accepted by BNSF. The parties' calculations differed because BNSF's calculation was based on the existence of a rate floor of $11.77 and PSO's calculation did not assume such a rate floor. The Agreement was terminated on December 31, 2001.

### C.     2006 Arbitration Decision

After the Agreement was terminated, BNSF sought to recover alleged past-due underpayment of freight charges and interest from PSO based on BNSF's claim that the rate for its single-line service could not be less than $11.77 per ton. The parties agreed to arbitrate this dispute, and, on November 5, 2004, BNSF filed a petition in the United States District Court for the Western District of Oklahoma, requesting that the court appoint a new arbitrator to replace Mr. Gotcher, who had passed away. BNSF thereafter consented to transfer of the matter to this Court, and on February

14, 2005, the parties filed a Joint Motion to Appoint Arbitrator ("Joint Motion") before Judge Ellison.

In the Joint Motion, the parties jointly requested that the Court issue an order containing the following directions to the Board:

> (a)  The [Board] shall adjudicate BNSF's claim that, pursuant to the [1994 Arbitration Decision] and the [Agreement], the amount of the rate for BNSF single-line service, as provided for in the [1994 Arbitration Decision], cannot be less than $11.77 per ton.
>
> (b)  The [Board], in adjudicating BNSF's Claim, shall address all PSO's defenses to BNSF's Claim, including PSO's defense that BNSF's Claim is time-barred, and all of BNSF's responses to such defenses.
>
> (c)  The [Board] shall not consider any claims by BNSF or PSO other than the BNSF Claim referenced in (a) above.

(*See* Doc. 16.) On March 21, 2005, Judge Ellison issued an Order, incorporating the above language and appointing the Honorable Thomas R. Brett to replace Mr. Gotcher. (*See* Doc. 30.)

The parties thereafter submitted written materials to the Board, and a one-day hearing was held on January 11, 2006. On April 24, 2006, the Board issued its Findings of Facts and Conclusions of Law ("2006 Arbitration Decision"). (*See* Doc. 36.) Although the Board found BNSF's Claim to be timely (*see id.* 14-17), the Board rejected BNSF's contention that the rate for single-line service could not be less than $11.77 per ton (*see id.* 17-21). In declining to find such a "rate floor," the Board looked to terms of the Agreement and the 1994 Arbitration Decision. One member of the Board, Mr. Cole, submitted a four page dissent, in which he declined to join the majority of the Board and stated his belief that the 1994 Arbitration Decision re-set the rate floor at $11.77 per ton. (*See id.* 23-27.)

### D.      Motion to Vacate

On May 6, 2006, PSO filed a Motion for Order Confirming Arbitration Award and Motion for Entry of Judgment on Award (Doc. 38). The Court granted this motion in a Confirmation Order (*see* Doc. 44), and Judgment was entered. (*see* Doc. 45). Thereafter, BNSF simultaneously filed its Motion to Vacate (Doc. 46) and a Motion to Reconsider the Arbitration Confirmation Order and Final Judgment ("Motion to Reconsider") (Doc. 47). In the Motion to Reconsider, BNSF argued that the Court should reconsider and vacate the Confirmation Order and Judgment because "notions of fundamental fairness, and the interests of justice, warrant the reconsideration and revocation BNSF seeks so that the merits of BNSF's motion to vacate the arbitration award are considered." (Mot. to Reconsider 1.) The Court granted the Motion to Reconsider, finding that reconsideration of the Confirmation Order and corresponding Judgment was proper in light of BNSF's recently-filed Motion to Vacate. The Court then set a briefing schedule for the Motion to Vacate, which has been completed by the parties.

## II.     Standard of Review

Generally, a court will set aside an arbitration award only in "very unusual circumstances." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995). As stated by the Tenth Circuit, "[j]udicial review of arbitration panel decisions is extremely limited; indeed, it has been described as 'among the narrowest known to law.'" *Dominion Video Satellite, Inc. v. Echostar Satellite, L.L.C.*, 430 F.3d 1269, 1275 (10th Cir. 2005) (citing *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932 (10th Cir. 2001)). "In consenting to arbitration, 'a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" *Bowen*, 254 F.3d at 932 (internal citations omitted). Courts are to "exercise caution in setting aside

arbitration awards because 'one purpose behind arbitration agreements is to avoid the expense and delay of court proceedings.'" *Id.* "A court may not, therefore, independently judge an arbitration award." *Id.*

"Mindful of the strong federal policy favoring arbitration, a court may grant a motion to vacate an arbitration award only in the limited circumstances provided in the [Federal Arbitration Act] or in accord with a few judicially created exceptions." *Id.* Pursuant to the FAA, a court may vacate an arbitration award under the following circumstances:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced;

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). Further, there also exists the "judicially-created basis for vacating an award when the arbitrators acted in 'manifest disregard of the law.'" *Dominion Video*, 430 F.3d at 1275 (internal citations omitted). Under such circumstances, the arbitration panel's decision must exhibit "willful inattentiveness to governing law." *Id.* "Merely erroneous interpretations or applications of law are not reversible." *Id.* "A finding of manifest disregard means the record will show the arbitrators knew the law and explicitly disregarded it." *Id.*

**III.    Discussion**

BNSF moves to vacate the 2006 Arbitration Decision on two bases.  First, BNSF argues that the Board "exceeded their powers" and therefore invokes section 10(a)(4) of the FAA ("Section 10(a)(4)").[3]  (Mot. to Vacate 16-17, 20-21.)  BNSF also maintains that the Board "incorrectly interpreted unambiguous Agreement language."  (*Id.* 18.)  The Court will address each argument in turn.

BNSF first cites Section 13 of the Agreement in asserting that the Board exceeded their powers in the 2006 Arbitration Decision.  As outlined above, Section 13 outlines those controversies that "shall be submitted to an arbitration board," including issues with respect to "renegotiation of the rate of the rate of escalation (Section 11)."  (Agreement, Ex. 1 to BNSF's Mot. to Vacate, at § 13.1.)  BNSF argues that these issues "did not include whether renegotiation of the Effective Rate to an amount less that $14.00 per net ton, or substitution of indices for the escalation formula provided for in Subsection 4.2, eliminated from the Agreement the Base Rate term and a minimum rate floor amount to the Effective Rate."  (Mot. to Vacate 16.)

The Court rejects BNSF's first argument for two reasons.  First, the Board's decision that neither the Agreement or the 1994 Arbitration Decision created a rate floor of $11.77 was directly

---

[3] To the extent that BNSF argues that another, less stringent, standard applies when a party seeks vacation of an arbitration award under Section 10(a)(4), the Court rejects such a position.  In *Dominion Video*, the Tenth Circuit entertained an argument made under Section 10(a)(4) without suggesting that it was doing so under a different standard of review.  *See Dominion Video*, 430 F.3d at 1277 n.4; *see also Bowen*, 254 F.3d at 932 (outlining the "highly deferential standard" under which a court reviews an arbitration award before noting that defendant's challenge to arbitration award was based, in part, on argument that arbitrators exceeded their powers); *In re Arbitration Between Insurance Intermediaries*, No. 02-2156-JWL, 2002 WL 1602417, at * 2 (D. Kan. July 17, 2002) (unpublished) (quoting Section 10(a)(4) and then stating "[t]he Tenth Circuit has emphasized the extremely limited nature of the provision").

8

related to "renegotiation of the rate of the rate of escalation" in Section 11, as outlined in Subsection 13.1 of the Agreement. It was the parties' renegotiation of the Effective Rate that led to the dispute over whether a rate floor remained inherent in the Agreement. It is well-settled that, "[i]f a contract contains an arbitration clause, a presumption of arbitrability arises." *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) (internal citations omitted). This presumption may be overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* "All doubts should be resolved in favor of coverage." *Id.* In this case, BNSF has not demonstrated that Section 13.1 "is not susceptible of an interpretation" that covers the instant dispute. *Id.*

Second, "[e]ven if a particular dispute is not within the original arbitration agreement between the parties, 'it is hornbook law that parties by their conduct may agree to send issues outside an arbitration clause to arbitration.'" *Peruvian Connection Ltd. v. Christian*, 977 F. Supp. 1107, 1111 (D. Kan. 1997) (citing *Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228, 231 (2d Cir. 1982); *Valley Decking Co. v. Local Union No. 9*, 841 F. Supp. 354, 356 (D. Colo. 1994) ("Agreement to arbitrate may also be implied from the parties' conduct.")). "Once the parties have gone beyond their promise to arbitrate and have actually submitted an issue to an arbiter, [a court] must look both to their contract and to the submission of the issue to the arbitrator to determine his authority." *Peruvian Connection Ltd.*, 977 F. Supp. at 1111 (internal citations omitted).

In this case, the parties jointly submitted the following issue for adjudication by the Board: "The [Board] shall adjudicate BNSF's claim that, pursuant to the [1994 Arbitration Decision] and the [Agreement], the amount of the rate for BNSF single-line service, as provided for in the [1994 Arbitration Decision], cannot be less than $11.77 per ton." (Joint Mot. to Appoint Arbitrator 3.)

BNSF therefore put before the Board the precise issue that it now contends is outside the Board's scope of authority. The scope of issues submitted to the Board controls its authority, and BNSF cannot escape an unfavorable decision by claiming after the fact that the Board was without authority to hear the dispute. *See Peruvian Connection Ltd.*, 977 F. Supp. at 1112, 1114 ("Where a disagreement exists over the scope of the arbitration agreement, and where the parties nevertheless voluntarily submit their dispute to arbitration, they evidence a subsequent agreement for private settlement which would cure any defect in the arbitration clause.") (internal quotations and citations omitted) (holding that even if the arbitration clause did not encompass the question at issue, "the scope of the issues submitted to the arbitrator controls his authority, and the record reflects the parties' submission of [said question] to the arbitrator").

With regard to BNSF's second argument – that the Board erroneously interpreted the terms of the Agreement – the Court also finds this argument to be without merit. As noted by the Supreme Court, "it is the arbitrator's construction which is bargained for, and so far as the arbitrator's decision concerns construction of the contact, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of Am. v. Enter. Wheel and Car Corp.*, 363 U.S. 593, 599 (1960) (cited with approval in *Jenkins v. Prudential-Bache Sec., Inc.*, 847 F.2d 631, 635 (10th Cir. 1988)). A court "thus will not interfere with an arbitrator's decision unless it can be said with positive assurance that the contract is not susceptible to the arbitrator's interpretation." *Jenkins*, 847 F.2d at 635 (internal citations omitted). In this case, the Court is unwilling to find that the Agreement is not susceptible to the Board's interpretation, thereby rejecting BNSF's motion to vacate the 2006 Arbitration Decision on such basis.

**IV.     Conclusion**

For the reasons stated herein, BNSF's Motion to Vacate (Doc. 46) is DENIED. Under 9 U.S.C. § 9, the Court must confirm an Arbitration Award "unless the award is vacated, modified, or corrected" under §§ 10 and 11 of the Federal Arbitration Act. Because the Court is denying BNSF's Motion to Vacate, entry of an Order confirming the Award of the 2006 Arbitration Board is appropriate. The Court therefore GRANTS PSO's Motion for Order Confirming Arbitration Award and Motion for Entry of Judgment (Doc. 38). A separate Judgment will be entered.

**SO ORDERED this 19th day of August, 2009.**

_____
**TERENCE KERN**
**United States District Judge**